**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| SHAINA WILKINS, et al., | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | No. 4:25-cv-00645-JMD |
| BRAD ARTEAGA, et al., | ) | |
| *Defendants*. | ) | |

**MEMORANDUM AND ORDER**

This case is tragic. St. Louis Police Detective Brad Carlson shot 17-year-old E.W. during a foot chase. Worse, Carlson shot E.W. from behind. Worst of all, the shot killed E.W. In light of those tragic facts, the Missouri prosecuting attorney recently considered criminal charges against Carlson. But after a full review, that prosecutor declined to press charges because there was insufficient evidence to prove that Carlson's actions were "objectively unreasonable" in the circumstances. *Circuit Attorney Press Statement* (Oct. 2, 2026).[1]

For similar reasons, the Court concludes that the doctrine of qualified immunity protects Carlson from federal civil liability. The Constitution generally permits deadly use of force when there is "probable cause to believe that the suspect poses a threat of serious physical harm." *Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). And qualified immunity protects even those who violate a constitutional right, so long as the "purported right was not 'clearly established' by prior case law." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 227 (2009)). To defeat summary judgment, E.W.'s family must prove that it was "beyond

[1] https://www.circuitattorney.org/news/circuit-attorneys-office-announces-findings-in-emeshyon-wilkins-matter

debate" that Carlson lacked probable cause and that his use of force was unconstitutional. *Mullenix v. Luna*, 577 U.S. 7, 14 (2015) (per curiam). On this record, they have not done so.

The gunshot did not occur in a vacuum. Suspected of having committed a felony, E.W. had been fleeing from police both in a vehicle and on foot. Another officer had issued a radio warning that E.W. was armed with a gun. E.W. in fact had a gun, and he placed his hand near it while fleeing from Carlson. He ignored police commands. And he tried to run through a narrow gap between two buildings, in the general direction of another officer, in a residential neighborhood with bystanders present. E.W.'s family has identified no on-point case law that would clearly establish that Carlson's actions were, "in these circumstances," a constitutional violation "beyond debate." *Id.*

As it turns out, the gun was partly disassembled. The entire gun was in E.W.'s pocket, but the slide and spring were not attached, so the gun was not operable when it was recovered. But qualified immunity is judged based on the information known at the time, not information learned later.

This case is a tragedy. But not every tragedy triggers liability under the Constitution. E.W.'s family might be able to succeed on their claims under state law. The Court does not decide those issues. Because the federal claims fail, this federal court cannot exercise jurisdiction over those state claims. E.W.'s family must bring them in state court.

## Background

Because the police officers and the board of police are the ones moving for summary judgment, it is E.W.'s "family's side of the story" that "matters at this point." *N.S. ex rel. Lee v. Kan. City Bd. of Police Comm'rs*, 35 F.4th 1111, 1113 (8th Cir. 2022). The one exception is the body camera footage. "[W]hen undisputedly reliable video footage captures the relevant events," the Court will view the evidence in "the light depicted by the videotape." *Klum v.*

*City of Davenport*, 145 F.4th 907, 912 (8th Cir. 2025) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)). The following facts are not in dispute.

While on patrol, members of the St. Louis Police Anti-Crime Task Force observed a vehicle that Detective Joseph Carr suspected was stolen. Knowingly operating a stolen vehicle is a felony in Missouri. Mo. Rev. Stat. § 569.080.1(2). Officers followed the vehicle and attempted a traffic stop, pulling behind the suspect vehicle and activating lights and sirens. But the driver, E.W., fled. Officers say they saw E.W. open the driver's door during the pursuit, displaying a black object they believed to be a firearm. Detective Carr broadcast over the radio to the other members of the task force that E.W. had a handgun.

Officers eventually spike stripped the vehicle's tires, forcing it to slow down. The detectives say E.W. exited the vehicle while it was still moving and fled. Officers engaged in foot pursuit. E.W. ran along an alley street behind several residences.

Another member of the task force, Detective Carlson was wearing a body camera. According to the footage, Carlson exited his vehicle near the alley and began foot pursuit. Carlson cut across a grassy area toward E.W. and, around ten seconds after exiting his vehicle, came within about 20 feet of E.W. E.W. then turned off the alley street toward a narrow gap between two residences, which led to the front of those residences. Another officer, Detective Cameron Jackson, was on the street that ran in front of the residences. As established by the video, Carlson shouted to E.W. to get on the ground and then twice shouted at him to drop the gun. E.W. kept running and at one point placed his hand near his waist area. Carlson fired four shots just before E.W. entered the gap between the residences that would have deposited him near Detective Jackson. One bullet hit the back of E.W.'s head, killing him.

Officers recovered a firearm from E.W. The video from Carlson's body camera shows the frame of a handgun protruding from E.W.'s pocket. But when officers removed the

handgun from his pocket, it was partly disassembled. The slide was not on the frame, and the recoil spring was loose. The frame, the slide, and the spring—the complete firearm—were all in E.W.'s pocket. A black cell phone was near E.W.'s right hand.

E.W.'s family sued Carlson and the St. Louis Board of Police Commissioners, alleging (among other things) (1) a claim against the Board under § 1983 for unreasonable seizure in violation of the Fourth Amendment, (2) a claim against Carlson under § 1983 for unreasonable seizure in violation of the Fourth Amendment, (3) a claim against Carlson for wrongful death and assault and battery in violation of Missouri law, (4) a claim against the Board for negligent hiring in violation of Missouri law, and (5) a claim against the Board for negligent supervision in violation of Missouri law. Carlson and the Board move for summary judgment on all claims.

## Legal Standard

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Metro. Prop. & Cas. Ins. Co. v. Calvin*, 802 F.3d 933, 937 (8th Cir. 2015) (quoting *Raines v. Safeco Ins. Co. of Am.*, 637 F.3d 872, 874 (8th Cir. 2011)). Carlson and the Board bear the initial burden to "identify those portions of the record" which they believe "demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up). E.W.'s family must then respond with "affirmative evidence, specific facts, showing that there is a genuine dispute on that issue." *Hodge ex rel. Farrow v. Walgreen Co.*, 37 F.4th 461, 465 (8th Cir. 2022) (citation omitted).

## Analysis

Carlson is entitled to qualified immunity. And because there is no underlying individual liability, the Board also cannot be liable. Finally, because this order disposes of

all federal claims, the Court does not exercise supplemental jurisdiction over the claims brought under state law.

## I.

E.W.'s family sues Carlson under § 1983 for unreasonable seizure in violation of the Fourth Amendment.[2] But "the Court need not, and does not, decide" whether Carlson "violated the Fourth Amendment when he used deadly force" against E.W. *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (per curiam). "[E]ven assuming a Fourth Amendment violation occurred," Carlson is "at least entitled to qualified immunity." *Id.* at 103–04. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam) (cleaned up).

A plaintiff who seeks to show that the law is clearly established faces a high hurdle. It is not enough to tilt the scales and prove that some conduct violated the Constitution. Instead, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 79 (cleaned up). The relevant precedent must answer the constitutional question with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). In other words, "[t]his demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (cleaned up).

E.W.'s family thus can avoid summary judgment in only two circumstances. First, they can "identify a case where an officer acting under similar circumstances was held to

---

[2] E.W.'s family also alleges violations of the Eighth and Fourteenth Amendments. ECF 37 at 4-7. But "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989).

have violated" the Constitution. *City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam) (cleaned up). Second, E.W.'s family could prove that Carlson's alleged unconstitutional use of force was so "obvious" that no precedent is needed because "any competent officer would have known" that the use of force "would violate the Fourth Amendment." *Kisela*, 584 U.S. at 105–06. E.W.'s family has made neither showing.

**A.**

E.W.'s family has "failed to identify a case where an officer taking similar actions in similar circumstances was held to have violated the Constitution." *Zorn v. Linton*, 607 U.S. 568, 574 (2026) (cleaned up). E.W.'s family tries to compare this case to five others—"*Garner*," "*Capps*," "*Nance*," "*Moore*," and "*Craighead*." ECF 80 at 12. None of these cases, alone or collectively, establishes law so clear and so settled that every reasonable officer would have acted differently than Carlson.

Start first with *Tennessee v. Garner*, 471 U.S. 1 (1985), the lone Supreme Court case E.W.'s family presses. Reliance on *Garner* is insufficient because "*Garner* [and its progeny] do not by themselves create clearly established law outside an 'obvious case.'" *Kisela*, 584 U.S. at 105 (quoting *White*, 580 U.S. at 80). *Garner* at most "stands for a general proposition" that deadly force is not always authorized to apprehend a fleeing felon, so it "cannot clearly establish the rule in most cases." *Goffin v. Ashcraft*, 977 F.3d 687, 692 (8th Cir. 2020). In fact, *Garner* differs from this case many times over. First, in *Garner*, "all the individual defendants" had been dismissed; the plaintiff challenged only a state "policy" about using deadly force. 471 U.S. at 22. Second, in *Garner* there was "no articulable basis" for the officer "to think Garner was armed." *Id.* at 20. Here, E.W.'s family admits that Detective Carr broadcast over the radio to all other detectives that E.W. had a handgun. The pistol grip of a handgun can be seen on Carlson's body camera video protruding from E.W.'s right pants

pocket. And a handgun was in fact recovered from E.W. (although in a partially disassembled form). On video, Carlson also expressed subjective belief that E.W. had a gun. He twice commanded E.W. to "drop that f*ing gun." ECF 72-4; *cf.* Fed. R. Evid. 803(2) (excited utterances carry sufficient indicia of trustworthiness to overcome hearsay bar). The general proposition announced in *Garner* does not clearly establish the outcome of this distinct case.

Next, consider the four circuit-court cases E.W.'s family cites. All are cases from the Eighth Circuit, so it is unclear any of them is sufficient to "clearly establish" the law. To be sure, the Supreme Court previously suggested that circuit precedent might create clearly established law, holding that "controlling authority" or "a robust consensus of cases of persuasive authority" can clearly establish law. *Wesby*, 583 U.S. at 63 (cleaned up); *but see id.* at 66 n.8 ("We have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity."). But more recently, the Supreme Court faulted a party for failure to "identif[y] any *Supreme Court* case" that "addresses facts like the ones at issue here." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (emphasis added). And both the Supreme Court and the Eighth Circuit have expressly reserved the question whether "Circuit precedent can clearly establish law for purposes of § 1983." *Id.*; *accord Martin v. Turner*, 73 F.4th 1007, 1010 (8th Cir. 2023) ("[a]ssuming without deciding that decisions of the Eighth Circuit may constitute clearly established law for qualified-immunity purposes"). It is hard to say that any of these circuit-court cases clearly established the law when it is not even clearly established that circuit-court cases *can* clearly establish the law.

"Even assuming that Circuit precedent can clearly establish law for purposes of § 1983," *Rivas-Villegas*, 595 U.S. at 6, the four circuit-court cases that E.W.'s family cites—

*Capps*, *Nance*, *Moore*, and *Craighead*—are all materially different from this one. None establishes what an officer would have to do in the circumstances presented here.

A jury in *Capps*, for example, could have concluded that "Deputy Olson did not believe Capps possessed a weapon at the time of the shooting." 780 F.3d 879, 885 (8th Cir. 2015). The officer radioed dispatch that it was "unknown" whether Capps had weapons, the officer did not "say anything about a weapon to the first two officers who arrived on the scene after the shooting," and no one even searched for a weapon until "almost two hours after the shooting." *Id.* at 883. Here, by contrast, it is undisputed that Detective Carr broadcast over the radio to other officers on the task force that E.W. had a handgun. The body camera video shows the frame of a handgun protruding from E.W.'s right pants pocket. Carlson also twice ordered E.W. to drop the gun that Carlson believed E.W. was carrying. And after putting E.W. in handcuffs, Carlson announced, "the gun's right f*ing here." ECF 72-4. E.W.'s family has not provided any affirmative evidence that Carlson subjectively believed that E.W. did *not* have a gun.

*Nance* is likewise "materially distinguishable from this case." *See Rivas-Villegas*, 595 U.S. at 6. Unlike here, *Nance* had no car chase followed by a foot chase. Instead, "plain-clothed officers confronted two *children* after dark who were *walking* toward an apartment complex." *N.S.*, 35 F.4th at 1115 (emphasis in original) (distinguishing *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009)). "They shot one of them without warning after seeing what turned out to be a toy gun in the child's waistband." *Id.* The undisputed facts in this case are the opposite. E.W. was *running* from multiple uniformed police detectives, in the general direction of another officer, after a car chase where officers felt they needed to spike the tires on the car because E.W., the driver, refused to stop. Officers also suspected that E.W. was committing a felony when they tried to stop him. And unlike the children walking with a toy

gun, E.W. had an actual gun that was visibly protruding from his pocket. Yes, the gun was partly disassembled when recovered by police. But even assuming that the gun was partly disassembled as E.W. was fleeing (and did not become disassembled because of his fall), nothing in the record suggests the officers knew the gun was disassembled.

*Moore* also does not "squarely govern[] the specific facts at issue." *Kisela*, 584 U.S. at 104 (cleaned up). The officer there conceded that he "did not see Moore with a gun and that Moore did not pose a threat to his safety." *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008); *see also Wallace v. City of Alexander, Ark.*, 843 F.3d 763, 768–69 (8th Cir. 2016) (deadly force unreasonable where suspect "had thrown his gun out of reach"). Here, in contrast, the officer has not conceded that E.W. was unarmed. E.W. in fact had a gun, which was visible on the body camera footage. The officer ordered E.W. to drop the gun. And upon putting E.W. in handcuffs, Carlson announced, "the gun's right f*ing here." ECF 72-4. E.W.'s family has also not produced any statement by Carlson that he did not believe E.W. posed a threat to anybody's safety.

"Nor is [this case] like *Craighead*," where "a police officer encountered an assault victim struggling with a perpetrator over a gun that was pointed in the air, and without warning fired a shotgun blast that killed the innocent victim." *Liggins v. Cohen*, 971 F.3d 798, 802 (8th Cir. 2020). The officer in *Craighead* was faced with two individuals in a close, hand-to-hand scuffle. The officer knew one of those people was innocent, yet he chose to use a *shotgun*, a weapon with a high blast radius, in a situation where "a trained shooter would have known that the shot would hit both men." *Craighead v. Lee*, 399 F.3d 954, 960 (8th Cir. 2005). *Craighead* itself distinguished the facts of that case from a situation where an individual is "fleeing" a police officer. *Id.* at 962 & n.4. By contrast, here it is undisputed

that E.W. was fleeing from Carlson. Further, the officer in *Craighead* gave "no commands." *Id.* at 959–60. Carlson did.

"At most," *Garner*, *Capps*, *Nance*, *Moore*, and *Craighead* "would create uncertainty for someone in [Carlson's] shoes." *N.S.*, 35 F.4th at 1115. But uncertainty is the antithesis of clearly established law. In this context, uncertainty guarantees qualified immunity.

If anything, Eighth Circuit precedent favors Carlson. The Eighth Circuit has held that a police officer was entitled to qualified immunity when, after a brief foot chase, the officer shot from behind, without warning, an unarmed person suspected of stealing a cell phone. *N.S.*, 35 F.4th at 1113–14. The alleged crime there was less serious than the one here. That officer, like Carlson, mistakenly believed the suspect had a gun at the ready. But if anything, the mistake in *N.S.* was worse. E.W., unlike N.S., *did* have a firearm; it just is not clear in hindsight whether it was operational.[3] The "possibility" that the fleeing suspect "might shoot a fellow officer" is also comparable to *N.S.* *Id.* at 1114. It is undisputed that E.W. was running in the general direction of Detective Jackson during the foot pursuit. While E.W. was not "very close" to another officer as N.S. was, *N.S.*, 933 F.3d at 969, E.W.'s family appears to acknowledge that at least Detective Jackson was "in the line of fire" across the alley "when the shots were fired," ECF 76 at 28 (cleaned up). So while "there are some differences" between this case and *N.S.*, "[n]one of the cases discussed by the family are any closer." *N.S.*, 35 F.4th at 1114–15.

[3] E.W.'s family notes that E.W. may have been carrying a cell phone, and a cell phone was recovered near E.W.'s right hand after he fell. ECF 80 at 9. So it is possible that Carlson saw E.W.'s cell phone in E.W.'s hand and mistook it for a firearm. But that kind of mistaken impression does not undermine qualified immunity. *Loch v. City of Litchfield*, 689 F.3d 961, 966 (8th Cir. 2012).

**B.**

With no "squarely govern[ing]" precedent and with the case that is most on point (*N.S.*) cutting in favor of qualified immunity, the only avenue left to E.W. to avoid qualified immunity is proving that this case is such "an obvious case" that "any competent officer would have known that shooting [E.W.] . . . would violate the Fourth Amendment." *Kisela*, 584 U.S. at 104, 105–06 (cleaned up). "That inquiry into the reasonableness of police force requires analyzing the totality of the circumstances," *Barnes v. Felix*, 605 U.S. 73, 80 (2025) (cleaned up), and "appreciat[ing] the extraordinary dangers and risks facing police officers and the community at large," *id.* at 90 (Kavanaugh, J., concurring). Eleven facts make it "far from obvious" that every "reasonable officer" would have found it "obvious" that deadly force was impermissible. *Kisela*, 584 U.S. at 107 (cleaned up).[4]

1. E.W. was suspected of driving a stolen car, which is a felony in Missouri. *See* Mo. Rev. Stat. § 569.080.1(2).
2. After law enforcement attempted a traffic stop by pulling behind E.W.'s vehicle and activating lights and sirens, E.W. refused to stop and sped away from law enforcement.
3. Officers spike stripped the tires on the car E.W. was driving.
4. E.W. still did not stop and instead exited the car and continued fleeing.
5. Another officer broadcast over police radio that E.W. had a handgun.
6. Carlson shouted commands to E.W. to drop the gun and stop running.
7. E.W. did not obey Carlson's commands to stop but instead continued fleeing.
8. During the foot chase, E.W.'s hand was near his waist.

[4] E.W.'s family disputes whether later statements Carlson made about the incident are admissible because Carlson invoked the Fifth Amendment during his deposition. The Court need not resolve this dispute because the following facts are undisputed by the parties.

**9.** E.W. was running toward another officer.

**10.** The video shows a firearm protruding from E.W.'s pocket, and a complete (albeit partly disassembled) firearm was recovered from E.W.'s pocket.

**11.** All this occurred in a residential area during the day, when innocent bystanders could reasonably be expected to be present.

"Cases" have "not clearly established that deadly force is inappropriate in response to conduct like" E.W.'s. *Mullenix*, 577 U.S. at 16. "The general principle that deadly force requires a sufficient threat hardly settles this matter." *Id.* at 14. Because a reasonable officer in these circumstances "might not have known for certain" that using lethal force "was unlawful," Carlson is entitled to qualified immunity. *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017).

Against all this, E.W.'s family posits three "preconditions" that they argue Carlson should have checked off before resorting to "deadly force." *Scott*, 550 U.S. at 382. They argue E.W. was (1) unarmed, (2) suspected of committing only a nonviolent offense, and (3) was given no warning. But these factors are not "magical on/off switch[es]" for Fourth Amendment purposes, *Scott*, 550 U.S. at 382. And none of them makes it entirely obvious that Carlson's use of deadly force in this case was constitutionally unreasonable.

**1.** Start with the "unarmed" factor. The notion that "[i]t is objectively unreasonable to use deadly force against an unarmed suspect" is "not the law." *Loch*, 689 F.3d at 966 (cleaned up). Rather, "[a]n act taken based on a mistaken perception or belief" that a suspect is armed, "if objectively reasonable, does not violate the Fourth Amendment." *Id.* "Even if a suspect is ultimately found to be unarmed, a police officer can still employ deadly force if objectively reasonable." *Id.* (cleaned up). Here, viewed in the light most favorable to E.W.'s family, Carlson was ultimately mistaken that E.W. had a working firearm in his possession. But E.W. provided no evidence undermining these key facts: (1) officers were told that E.W.

had a handgun; (2) the frame of the handgun was visible and protruded from E.W.'s right pants pocket; (3) Carlson shouted commands to E.W. to drop the gun and stop; (4) E.W. did not obey; (5) upon putting E.W. in handcuffs, Carlson announced, "the gun's right f*ing here," ECF 72-4; and (6) when the contents of E.W.'s right pants pocket were later emptied, a full firearm was in fact recovered (although it was partly disassembled). So even if it were inherently "unreasonable to use deadly force against an unarmed suspect," *contra Loch*, 689 F.3d at 966, this is not the "obvious case" where every reasonable officer would know for certain that the suspect was unarmed, *White*, 580 U.S. at 80 (citation omitted).

It also makes no difference that the handgun in E.W.'s pocket was not currently operational. Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Carlson was "not constitutionally required to wait until he sets eyes" upon a working weapon "before employing deadly force to protect himself against a fleeing suspect" who "moves as though to draw a gun." *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). It was not obvious at the time of the pursuit that deadly force would be unnecessary to prevent serious physical harm to persons near E.W. It was not apparent until later that the gun was partly disassembled.

E.W.'s family also argues that because the gun was in E.W.'s pocket, not his hand, there was no serious threat of physical harm. And they say that when E.W. moved his hand toward his waist, that was consistent with holding up sagging pants. But an officer's mere "[m]isinterpret[ation]" of a suspect's "gesture" does not automatically trigger liability under the Fourth Amendment. *N.S.*, 35 F.4th at 1114–15. That is especially true where, as here, the suspect's arms continue to move despite an order to "stop." *Thompson*, 257 F.3d at 898. It is not even an obvious Fourth Amendment violation when an officer uses lethal force on a

suspect who is "rais[ing] his hands to his waist" with no gun in them to try to "surrender." *N.S.*, 35 F.4th at 1114–15.

If anything, the possibility of misinterpreted gestures undermines, rather than supports, the arguments of E.W.'s family. Whether E.W.'s arm moved toward his waist as a byproduct of a natural running motion, an attempt to hold up sagging pants, or an actual attempt to draw a firearm is irrelevant. What matters for purposes of qualified immunity is whether E.W.'s arm movements would have been obvious to every reasonable officer. The possibility of misinterpretation negates any suggestion that the correct course of action should have been universally obvious.

**2.** The "nonviolent" offense factor advanced by E.W.'s family also fails to turn this into an obvious case. That is because a suspect's acts during the "flight itself" are part of the analysis to determine the risk "of serious physical harm" to others. *Scott*, 550 U.S. at 382 n.9 (cleaned up); *Barnes*, 605 U.S. at 87 (Kavanaugh, J., concurring) ("The Fourth Amendment analysis must also take account of the suspect's attempt to evade the officer by flight." (cleaned up)). Deadly force against a person merely suspected of "stealing a cell phone" has been held not to trigger federal liability. *N.S.*, 35 F.4th at 1114–15. It has likewise been held to be reasonable to use deadly force on a suspect who has "committed only a minor traffic offense" and "as far as the police [a]re aware" has "no prior criminal record." *Scott*, 550 U.S. at 382 n.9. The circumstances of this flight refute the idea that there was anything inherently nonthreatening. E.W. was suspected of driving a stolen car, which is a felony in Missouri. Mo. Rev. Stat. § 569.080.1(2). And he operated it in a way—fleeing from police—that could put others at risk.

**3.** That leaves the "no warning" factor that E.W.'s family also argues makes Carlson's use of lethal force obviously unreasonable. ECF 80 at 10. But an officer may "remain[] silent"

and lethal force may still be reasonable. *N.S.*, 35 F.4th at 1114. Regardless, "some warning" was given here. *Garner*, 471 U.S. at 12. Before he fired, Carlson yelled at E.W. to "get on the f*ing ground now" and "drop that f*ing gun, drop that f*ing gun." ECF 72-4. E.W. ignored these commands and kept fleeing. It is thus not obvious that E.W. had "no warning" before Carlson resorted to lethal force. *Contra* ECF 80 at 10.

The Court stresses that it ultimately makes no ruling on the reasonableness of Carlson's use of lethal force in these circumstances. The Court merely makes these observations concerning the tragic circumstances in this case to highlight that it is "far from the obvious one where *Graham* and *Garner* alone offer a basis for decision." *Brosseau*, 543 U.S. at 199. Because E.W.'s family has not "identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation under similar circumstances" and "this is not an obvious case where a body of relevant case law is not needed," Carlson is "entitled to qualified immunity." *Wesby*, 583 U.S. at 65 (cleaned up).

**II.**

E.W.'s family also brings a claim against the Board under § 1983 for alleged unconstitutional policies or training. But because the Court has "concluded that the constitutional right at issue here was not clearly established," E.W.'s family "cannot prevail" on their "claims against the" Board of Police Commissioners either. *Lombardo v. City of St. Louis*, 38 F.4th 684, 692 (8th Cir. 2022).[5] "[I]n order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005). Because all federal claims for individual

[5] The Board of Police Commissioners is now a state-level agency. At the time of the shooting, it was a municipal agency. *See* Mo. Rev. Stat. § 84.325 (transferring control of the St. Louis Metropolitan Police Department to a state board and requiring the transition to be complete by July 1, 2026).

liability brought by E.W.'s family fail as a matter of law, the § 1983 claim against the Board also must fail as a matter of law.

**III.**

Having held that summary judgment on all the federal claims in this case is proper, and having considered the "four factors enumerated in the federal supplemental-jurisdiction statute," *Wong v. Minn. Dep't of Hum. Servs.*, 820 F.3d 922, 933 (8th Cir. 2016), the Court declines to exercise supplemental jurisdiction over the remaining claims, which were brought under state law. A district court "ordinarily should" decline supplemental jurisdiction when it has dismissed or ruled on all federal claims before trial. *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").

**Conclusion**

The Court **GRANTS** Carlson and the Board's motion for summary judgment, ECF 70, on Counts I and II of Plaintiffs' Amended Complaint, ECF 37. The Court declines to exercise supplemental jurisdiction over Counts III through V of Plaintiffs' Amended Complaint, ECF 37. The Court **GRANTS** the parties' consent motion for leave to file under seal, ECF 78, and requests supplemental briefing from the parties within 30 days after the date of this order or 30 days after any appeal is resolved, whichever is later, stating the parties' positions on

whether continued sealing is necessary. All other pending motions, including but not limited to ECF 84 and ECF 86, are **DENIED** as moot.

Dated this 10th day of November, 2026

JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE
FOR THE EASTERN AND WESTERN
DISTRICTS OF MISSOURI